Okay, we'll call our next case, Boynes v. Limetree Bay Ventures, LLC, and go ahead and ask counsel for the appellant to come forward. Good morning, Your Honors. For the record, Stephen M. Orlovsky, Blank Rome, LLP, and we represent the appellant, Limetree Bay Terminals, LLC. Thanks. You may proceed, sir. Your Honor, I'd like to reserve five minutes for rebuttal, please. All right. Done. Thank you. As you know, this is an appeal from an injunction issued by the district court. And I think it's important, in analysis of that injunction, to read the specific language of the injunction that the district court issued. Quote, the court finds that plaintiffs have satisfied the four preliminary injunction factors with respect to those plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, close quote. Now, the district court conducted two hearings, a phase one hearing to address the entitlement to an injunction in the first place. We're well familiar with that. Okay. Let me just – I'm not going to bore you with what you already know, Judge. But what I want to focus on is at the phase one hearing, the plaintiffs presented five witnesses. None of the witnesses who testified at the phase one hearing testified that they had to – they could not afford to purchase water without trading off other basic necessities. Well, didn't they testify that, you know, one had to start dipping into Social Security, one had trouble having a caretaker for a father who suffers dementia, another one testified they had to go to another person's home to shower? I mean, all that was in front of the district court. So this event certainly caused them to have to make major modifications and some economic sacrifices to be able to have proper water. Well, there was also testimony that at least three of the witnesses who testified at the phase one hearing were already purchasing bottled water. Mr. Orlowski, somebody could buy bottled water for an occasional fresh drink and then – but not have to buy it for all of their needs, not have to buy it for all their drinking, not have to buy it for their bathing, not have to buy it for laundering their clothes, which is – and there was evidence on all that in the record, right? Well, there was some evidence. The question is, Judge, was there sufficient evidence to justify the extraordinary relief which the district court issued? Right now we're focusing on irreparable harm. Yes, Your Honor. So what about the witnesses who said, I'm using this contaminated cistern water. I can't afford to buy all this water. The fact they're using contaminated water, isn't that an important piece of evidence to the district court? Well, Your Honor, the catchphrase in your question, and I'm sure you're not – Your Honor wasn't intending to trick me, is the use of the phrase contaminated water. Now, the five witnesses – Allegedly contaminated cistern water, fine. Okay, but here's a critical point. Of the five witnesses who testified at the phase one hearing, none of their water was tested. It wasn't tested, but they are using cistern water that they reasonably fear has some contamination in it, correct? Well, I don't think – well, that's my point, Judge. I don't think that there's a reasonable basis for that. Well, wait a minute. Now you're fighting the merits, okay? Now you're fighting the merits. No, Judge, I'm not. I'm fighting the evidentiary basis for the issuance of a preliminary injunction. Was there or was there not expert testimony, including from your own expert, that pitch oil was spewed into the air over a wide area and affected the downwind sort of – and I should be careful here because I'm not sure of the orientation of that, but I think it's like the southwest corner of St. Croix. Isn't that – isn't that something your own expert agreed to happen? Here's the problem with that. Well, that's a yes or no. Yes. Okay. So there's your own expert saying pitch oil spewed in the air settles over parts of St. Croix. Then they have an expert that comes forward and says this stuff lasts and lasts. This pitch oil interacts with the organic material and concrete. It doesn't – it goes on and on. And they've got witnesses who say the water's still not right. And they've got people who say I get a rash when I try to bathe in it. And your own client comes out and says, in effect, we did this. It's a problem.  What is it about that constellation of information that somehow leads you to say there's no evidence or there's not a substantial basis for a finding that these people had a reasonable fear about contaminated water? What leads me to say that, Your Honor, respectfully, is that that data, that evidence, was two years old. But there was an expert, their expert, that said that lasts. Maybe two years old, but it lasts and it will linger for a long time because it's not like ordinary petroleum that will break down. And you had a person, one of the people affected, who said my water's still not right, still bad water. So she's got an expert and she's got a human being who's affected by it. Well, the critical question for me, Judge, is at the phase one hearing of the five witnesses, their cistern water could have easily have been tested to determine whether there was contemporaneous evidence of contamination. We ask what isn't here. We ask what is here. Why isn't what is here enough? And one of the things, just to follow up, one of the things that is there is some of them testified that representatives of the defendants went and offered to compensate them and address the issues that they were facing. So how do we say the district court clearly erred? We're not really looking at substantial evidence. That's not really our standard. Our standard is what do we have to show clear error in the district court's factual conclusions concerning all the things that have been recited by my colleagues to determine that that would be irreparable harm? Well, Judge, first of all, Your Honor, if I may. Sure. First of all, the efforts by Sedgwick, which came about shortly after the releases, were really efforts to settle claims. There's been no objection under the Federal Rules of Evidence that we can't consider it. I understand the purpose for it. They were trying to resolve it. They went to Clifton Hill. They did testing all over there. I understand none of the five who testified were Clifton Hill residents, but the court also had that testimony evidence in front, where there were the Clifton Hill area tested by the defendant all had evidence of the contamination. So my trouble is the standard of review must apply, which is concluding the district court committed clear error on this factual record. I'm just not sure how we can conclude that. Well, the difficulty we have with the evidence to which the court, which you, Judge Schwartz, and Judge Jordan, and Judge Bevis have pointed to, was stale. It was two years old. There was really no significant evidence of contemporary contamination at the time of the Phase I hearing. There was a bankruptcy, and there were things going on, and a water program was going on shortly after, and then that water program was stopped by the defendants. And I also don't remember a big staleness argument being made in the district court. Look, the bankruptcy really is irrelevant. Well, you're talking about delay, like the time frame between the discharges and the preliminary injunction proceeding, a period of time lapsed, and one of it was because of the bankruptcy. Am I being critical of the bankruptcy? Well, Your Honor, I don't mean to correct you, Your Honor. Please do. I don't want to be wrong. Judge, the delay was caused by the stay caused by the bankruptcy proceedings of terminals. So the district court action was stayed based on the stay of the bankruptcy. I'm with you on that. Okay. I think the point being made is that there may have been some delay, but there's two things in operation there. One, the implication of your argument is this is stale. What a problem. If it's stale, maybe it's stale for reasons that are not the fault of anybody, and that's just the way life is. There was a bankruptcy. It caused delay. But the district court was diligent in trying to move this forward. And second, is it really stale when you've got information from which the court could conclude that this pitch oil contamination is not going to go away, and you've got an actual, at least not for years and years, not a couple years, and you've got a resident coming in and saying it's still a problem, that water is still unsafe. If those things are in the record, why can't the district court believe them and say that it's still a problem? I'm imposing that sanction. I'm imposing not that sanction, but that injunction, that mandatory injunction to meet the problem. Well, I understand the position which the court's taking, and the evidence in the record is the evidence in the record. We still take the position that there was no— It's not enough. Correct, that there was no contemporary, present-day evidence at the time of the Phase I hearing that the water was contaminated. And our standard of review, let's do stay on that for a second. It's clear error. It's clear error as to the facts, right? Novo as to collusions of law, and obviously abuse of discretion with respect to the issuance of the injunction. Is irreparability a question of law or fact? I think it's a question of law. And the other point, separate and apart from the evidentiary issues which we've raised regarding staleness and the lack of contemporary evidence of contamination, we think that the ordering of a water program here was not— that this is something that could be cured by money damages or essentially— How could it be cured by money damages, Mr. Orlovsky, for somebody who can't afford to wait? I mean, that's the whole design that the district court put into effect was to limit this to people who couldn't be made whole by money damages because they couldn't afford to get the water on their own and then be made whole later. How is it not irreparable harm to say to somebody, you drink this dirty water or you go thirsty? Well, Your Honor, you sort of put the rabbit in the hat. Well, the rabbit is in the hat. The rabbit's already in the hat. That's the point. You can't fight the merits on this. You've got to deal with what the court's factual finding is. She said this is dirty water. So your argument about this could have been made whole by money damages has to accept that as a foundation or we're just no place. So accept that as the foundation. Now give me your argument for how telling somebody, drink dirty water, is acceptable or is the court entitled to say, no, I can't say that. If you can't afford to buy bottled water, then the person who allegedly is at fault here, and I have evidence he's at fault, is going to give you clean water. Why isn't that like perfectly logical and supportable? Well, other than the evidentiary foundations with which we respectfully disagree, I can't disagree with Your Honor the way you posed that question. Okay. If you want to make a separate likelihood of success argument, go ahead and make that. We're just talking on the river. Well, I'm going to get to that. Okay. Before we get to likelihood, though, I do want to talk some about the bond. About the what? About the injunction bond that's required. So the primary ask of the plaintiffs was for a $250 bond, and Judge Lewis didn't give that and expressed some skepticism and ultimately gave $50,000. So this isn't really a nominal bond from their perspective, right? A bond has two purposes. One of them is to indemnify you, and you've got an argument, some power, that $50,000 isn't nearly enough to indemnify your client if your client wins at the end. But the other is to make the plaintiffs think long and hard before going ahead with this and not get a P.I. willy-nilly. Wouldn't you agree that given that we've means-tested the plaintiffs, that $50,000 is a lot from their perspective? It's not nominal the way $250 would be. Well, Judge, they hadn't been means-tested before the bond was set. You're saying that's sort of like, you know, assuming the conclusion, I'm going to go. But what we're reviewing is an injunction that has a means-testing for the plaintiffs it covers that has this bond. Don't we have to review the whole thing together? Yes. Okay. Because obviously the injunction isn't effective without the establishment under Rule 65, without the establishment of a surety bond. Of the bond. Okay. And a means-test is in the injunction itself with if it turns out that there's more of these people than we thought, then the amount of the bond has to increase at $50 increments per person, right? I mean, she clearly was trying to make the district judge was clearly trying to titrate this, to measure it against the need, I guess the way to put it is to have the right level of pain for the plaintiff for them to not do this, as Judge Beebe has said, willy-nilly. Right? Isn't that like bait into it? Well, look, that's the purpose. That's one of the purposes of the bond. It's not only to indemnify the defendants who's wrongfully enjoined, but to discourage, you know, frivolous. What I'm saying is there are two purposes here, right? Correct. You fairly point out this is not nearly enough to indemnify your client. So that's one purpose, not satisfied the way it would be by, say, a $10 million bond. But the other purpose looks like it's satisfied here. So how do we approach that when there are two purposes and one of them seems to call for a higher bond and the other one says, like, no, this bond is high enough for the purposes of not doing it willy-nilly and think long and hard. Shouldn't we? Isn't that enough for? I think that's something that you have to balance. I don't think, you know, there's not a syllogism I can give you to say, you know, to plug the numbers in and the probabilities in and come up with a number. What we're saying is even if you means tested the plaintiffs, the amount of the bond is still in effect, given what it will cost my client to provide the water program, given the significant amount of money, that that is, you know, that's frivolous. And what you're essentially saying here is that, you know. I don't understand what's frivolous about it. Does a $50,000 bond really discourage anyone from bringing a frivolous? A multinational. It depends on who it is. I'm not talking about General Motors. If it were a multinational, it would be a different case. But the way that Judge Lewis means tested this, are you saying that 50, let's assume it's 1,000 people. We know it could be less or it could be more. $50 a person, would you say that's trivial for these people who are otherwise having to give up basic necessities or wash in water they fear is contaminated, et cetera? And also, just so I can follow up on that. Also, because of the way the eligibility is triggered, the individuals who will be joining this, to add that extra amount of money, have to meet the very low income status. Judge Schwartz, the problem with what you just said is you're sort of putting the cart before the horse. Well, the district court, though, had in front of her enough, one could say, to infer that those who are affected by these discharges are individuals whose economic circumstances are challenging. And as a result, she found a bond that would do what Judge Bebas talked about, cause reflection before seeking this kind of equitable and emergent relief, at the same time recognizing that it was important that water, which is a critical component of living, is provided. As a result, the district court was mindful of the economic ability of those plaintiffs, even though it may not fully compensate the defendant should they be found to be wrongly enjoined. Why is that not a proper exercise of her authority under Rule 65? Well, look, our point is that even if you adopt the analysis, which is correct, that you and Judge Bebas articulated, given the two purposes of establishing a bond, our position is that that bond, the $50,000 bond, in light of the significant amounts of money that my client will have to incur to fund the water program is still insufficient. What do you think would be the minimum Judge Lewis would have had to set to satisfy the law? Tell us what you think. Look, I think $50,000 is ridiculously low. We think $500,000, a million, something like that, which would make people think about bringing a case like this. So you don't think that a person who's by definition on public assistance and means-tested to be in poverty, you don't think that the money is not serious to them? $50,000. I'm just verifying, your position when you say that's ridiculously low is that's ridiculously low in light of, even in light of the means-testing. By the way, your Honor, I don't think Judge Lewis really did a means-test. We've got that. We can read it. We've read it. I don't think you're going to get a lot of traction on that point, Mr. Orlovsky. So I would let that one go. Your Honor, that's clear to me. I understand where the Court's going. So let me not waste your time and get on to another point, which I think is important, and that's the issue of the separate nature between refinery and my client terminals. They're both permittees under the— I'm sorry? They both have the permits, right? They're co-permittees. Well, I'm going to get to that, Judge. You may or may not get to that because we're 10 minutes past your time, and we may give you a little bit more time here. This is an important case, and we want your client to feel like it was well heard. But give me just a moment to ask my colleagues if that's an issue that you want to get on. Okay. We do have your briefing on it. If there's something you want to—I'll just ask you a question about it, and it's based on what my colleague Judge Schwartz just mentioned. As co-permittees under that Title V of the Clean Air Act amendments, even if we were to say, wait a second, there's a corporate failure which has to be scrupulously respected, why isn't the fact that it is a co-permittee and affirmatively in writing took on obligations to make sure that the actions of the operator of the terminal, of the refinery were going to be—were not going to cause releases damaging the environment? Why isn't that enough all by itself to give it a duty that under the law it should be held to? In short, Your Honor, because it was bound, contractually bound, by a contract with the Government of the Virgin Islands and refinery not to unduly interfere with the operations of refinery. So your position has to be we're obligated to make sure there aren't unlawful releases, but we contracted with the Government of the Virgin Islands not to fulfill our obligation under the permit. That's how it sounds. I mean, if they're obligated as permittees to be engaged and to make sure there's not— that things are being run in a way that will not cause an environmental disaster, how can it be the case that they can contractually free themselves from that? Well, I think if you unpack the transaction, Terminals was essentially selling the refinery to refinery. Refinery was taking over ownership and operation, including— How is it undue interference? I'm sorry? How is it undue interference to prevent someone from doing risky operations that might result in a major oil spill? Because, Your Honor— This is not a sale that's free and clear. Judge, they did not have—let's be fair here. Terminals did not have operational control. It did not have the ability to monitor the environmental compliance program that was in place or not in place. It didn't have the ability, or it chose not to exercise responsibility? Well, it was contractually prohibited from doing so, Your Honor. But the contracts themselves say that nothing in those agreements were intended to negate any part of the permit. Right. So the permit lived on past the entry of those agreements, the operating agreements. So it seems that the record tells us that as co-permittees, they continue to have obligations to ensure that the environmental laws were complied with. My only final point, and I appreciate the Court's indulgence in giving me some extra time, is that in issuing an injunction, as this Court has recognized and the Supreme Court has recognized, the issuance of a preliminary injunction is extraordinary relief, and it is an exercise of the equitable jurisdiction of the district court. And unfortunately, terminals was between a rock and a hard place. It was not off the Title V permit, but it entered into a contractual agreement whereby it had transferred ownership and operation to refinery and was prohibited from unduly interfering. So, you know, it was stuck with that. So it was essentially between a rock and a hard place. Well, you've reserved five minutes for rebuttal, and we'll have you back for rebuttal, Mr. Hrolowski. Thank you, Your Honor. You bet. And we will hear from your colleague on the other side, arguing on behalf of the appellees. Pleased to report, Daniel Shrest on behalf of the plaintiffs. He's a court-appointed co-lead on the case below and was one of the trial lawyers during the case. You want to start with the bond, please? Sure. What are we – I know we didn't discuss it with Mr. Hrolowski, but in the briefing it comes out that, hey, there's no end point on this. This is mandatory relief. And the judge didn't say anything about when this was all going to end. Is that a problem? I don't think it's a problem. It lasts until judgment is entered is the way it's going to work. I think it's a preliminary injunction by definition. I'm not sure I understand beyond that the issue. Well, how about the issue that this case has gone on for an awful long time already? What's the – what can you tell us about the schedule on this case? The schedule on the case, I can tell you the plaintiffs are pushing to go as fast as we can, and that's the reality. We're in the middle of – we had our Rule 26-F conference yesterday, and motions to dismiss are being filed, and we're going to get up and running. But, I mean, the – You haven't started discovery yet? Like not outside the preliminary injunction? As of – we didn't have any discovery for the preliminary injunction for the record. But, no, we have not – as of yesterday, discovery is open in the case officially, and we've been pressing to get there. But motions to dismiss are only now being scheduled and being considered. Like we're still effectively at the front end of this case. Yes, sir. And so how many years ago was the release reminded? It was in 21, in the first quarter of 21. And is there a trial date set? No, sir. So I don't have any idea how long this is going to go. No, sir. And – but the position you're taking is if this case takes five years, it takes five years, and that's okay? It's not just – it's not okay. They can go out there and clean the cisterns tomorrow if they want to. But the clients have dirty cisterns, and they have to live with that. The delay – and I'm not – you know, plaintiffs always want to move forward, and obviously the defendants want to go slow. But if they slow the process down, they've asked for a longer schedule than we want to have, then why should the clients bear the brunt of that? It's their litigation techniques and practices that have led to this delay in the first place. I can't do anything about it. We stayed in the bankruptcy court. We got out of the bankruptcy court. We proceeded directly to try and get the injunction set. Well, there was a mediation, right? There was a mediation in the bankruptcy, yes, sir. Would plaintiffs have any objection if, now that defendants are going to have to incur these costs, the defendant suddenly said, like, okay, let's speed this up to kind of minimize the amount we'll have to spend on this program? Would there be any objection to going down and setting a more expedited trial date and something like that? No objection at all, sir. We have – I'm not saying it. We have constantly and unceasingly tried to move the case forward as fast as we can. Why did it take so long to get to a Rule 26F proceeding? Because the defendant's objective to having it before. Before what? Before. Like before in terms of time or before a particular event. They wanted to get – they objected to having a Rule 26F conference until we actually physically served them with the consolidated complaint, even though all of them were already on the ECFs and in the hearings. And when did that happen? That happened, I don't know, whatever it was, in April sometime. We finished that. And then according to the court schedule, which we fought over, and she took literally the defendant's schedule 100%. The Rule 26F conference happened yesterday. I mean, I'm telling you, if anyone's upset about the urgency, if you all are, great. We are too. But we're trying our best to go forward. When you say the urgency, you didn't really expect them to respond to a complaint with a motion to dismiss when the complaint hadn't been filed. This was an amended complaint of some sort? We filed an amended consolidated complaint around the time of – I can't remember exactly, but around the time of the preliminary adjunction hearings. All of them received it on ECF. They got it, but they said, oh, no, we need to be served with it again. The judge indulged them and so said, okay, so we had to go through process servers and do that. And then they were – yes, I mean, they were taking every advantage of the process, and that's the law. I get it. But then for them to turn around and say, oh, look, for us, this is going to take a long time, that's what they're doing, not us. We would have the trial in six months' time. So are you saying that the consolidated amended complaint was filed in 2023? There were four complaints on – I don't know the exact date. So most recent, the complaint that you were referring to, that was in 2023, not 2024? I believe it was either the fourth quarter of 23 or the first of 24. And we may have – I think what happened was we filed the motion to amend, and then that pended for a bit, and then it was granted. Thank you. Okay. Now, you want to pick up on the argument concerning the adequacy of this amount because the questions we were putting to Mr. Orlovsky were about, well, clearly, one of the two purposes for a preliminary injunction bond is met in these circumstances. But they've got a strong argument that one of them isn't, that this is not sufficient to make them whole in the event it were determined on the merits that they should win and that they were wrongly enjoined. How – yeah. What authority should we be relying on to say, well, one out of two ain't bad, that it's enough that this puts a sufficient bite on the plaintiffs to make them think hard before they accept the mandatory relief, and it's okay for the make whole part of the purposes behind a bond to be left unmet? Well, let's start with the proposition that $50,000 is not a nominal bond. It's not a waiver of a bond. And so you get over that hump. Done. Right. Done. Fine. From there, you get on to what I think the Court did, and I think correctly. First, now we're in the world of discretion. So now we're in the world of discretion, which means it can only be overturned if it's arbitrary, fanciful, or clearly unreasonable. So that's the wiggle room we have. The reality is, and I think the Court, in the questions to the appellant, hit the nail on the head. The reality is that the participants in this program, by definition, are unable to pay any kind of a bond that would be anything like what the defendants want, whether collectively or individually. They could not afford it. They can't even afford to pay for water. By definition, it's hardwired into the program. And so then you get to the issues around, you know, is the bond a hardship? Absolutely. By definition, it is a hardship. Is it a bar to enforcement? By definition, it would be a bar to enforcement. We've given you all that. Done. You've got all that. It meets that second purpose, the think hard purpose. Now the question is, is the district court judge free to discount that first purpose of bonds that make whole purpose? And if so, what are you relying on to say that? Well, I think, I mean, I would look back to Temple that says under those situations, you could have no bond or a nominal bond. In light of Zambelli, which your colleagues cite and say has undercut Temple, how much force does the Temple University case still have? Well, I mean, we've cited in the brief that it's been cited even beyond Zambelli for the same purpose. Other cases have looked on it for the same reason. So they can say it's bad law, but Third Circuit doesn't say it's bad law. It is still a Third Circuit case that has not been overturned. And so I think that's as good as I can get you. So you're relying on Temple as the authority for the district court to have set a bond that would not compensate a defendant who may be found to have been wrongfully enjoined? Yes, ma'am, because under Temple, as I understand it, the court can order no bond. And so if you can order none for the same reasons, you can order one that doesn't satisfy one of the two criteria. But if you zoom out on those two issues, really, it's not it must do A and B. It's a combination. Those are the purposes. And then the court is within her discretion to do what she needs to do or what she thinks is appropriate. And then she weighs the balance. The other part of the analysis is you weigh the equities, and the balance clearly favors the movements in this situation. At the beginning of your comments concerning the bond that Judge Jordan was asking about, it sounded like you were reciting some kind of standard of review that we should apply. I just want to make sure I'm going to ask you the question then to see if that's what you were trying to tell us. Yes, ma'am. Given our job to review things within parameters of standards of review, what is the standard of review that we're supposed to apply concerning the bond amount? I would say Zambelli for the notion that that's the one I have written down here, but I'm sure it's pretty common, that is within the discretion of the trial court. And I don't know how to pronounce it, but Steyck, S-T-E-C-Y-K, 295F3 at 412, that it should be reversed only if, quote, arbitrary, offensible, or clearly unreasonable. And you understood that to be tethered to a review of bond amount? That's my understanding, yes, ma'am. Thank you. I'm honestly relying on my briefing, but that's my understanding. Okay. Mr. Chair, has the class been certified yet? No, sir. Okay. Isn't it typically – well, I'll ask it this way. Is it a problem that the district court provided relief to a putative class before making a decision about class certification? Or is that something we should be worried about or not? No, sir. I would point the court to the Adams case, which looms large on both sides of the briefs. The standard in Adams says, look, when you have – you can deal with injunctive relief as to a group of people, and it could be a class or a group of plaintiffs or a defined group. It doesn't have to be class, you know, Rule 23-level stuff. You can do it two ways. You can get affidavits and information from every individual, or you can build an adequate foundation to infer that whatever hardship or facts are related to the group that testified also pertains to the larger group. Those are the two sort of methods that you take out from Adams. Even though the larger group is not a named party, nor are they members of a certified class? Yes, ma'am. It doesn't – there is no limitation on that. It just happens in Adams that there was 130 plaintiffs. All 130 were named. There was 11 testifying witnesses, all of them who were plaintiffs, and three of the testifying witnesses actually articulated that irreparable harm. And so that's the sort of the funnel of information there. But there's nothing because of that procedural truth that means, oh, they must all be named plaintiffs, or it only applies to a class. It just – if you read Adams, what it says is it's the type of thing that fact finders do every day. You need to have an adequate basis, and then you can infer. But if you don't have the adequate basis. The difference here is the inference is asking the defendant to compensate persons who are not parties to a litigation. Isn't that a challenge for your – the remedy imposed here? There's no class yet, and they're not named parties. Well, that is true. They are members of the putative class. They are demonstrating that they will fit within the class by virtue of their geographic location and the impact, but there's no – To borrow Mr. Orlovsky's metaphor, have we got the cart before the horse? Did the district court get the cart before the horse? No, sir. I mean, the other – there's no other way to do it. There's no other way to try and get the people who are suffering as a result of these releases the relief that they're entitled to. Because it's a genuine emergency is your position. It is a genuine water emergency there. The people there, whether – and we talked about the recency that Mr. Orlovsky kind of pointed to. Their expert, our expert, their environmental person all agreed that this type of oil lasts for years, and our expert, up to decades. We had witnesses that say the water has gotten better but is still bad. You have other – the other thing that folks don't understand is, like, when you stop using the cistern, it stops being an active process in itself. Like, the inactivity of it makes the cistern get old and bad. And so – and you have this – like, everyone knows they got rained on by oil. Everyone knows that the water that falls and goes into the cistern follows the same path that the oil did, and everyone there knows that they have this contamination in their cisterns. And they can either suffer like most of the people are doing for the time or they can get relief from the parties that more likely than not, on a likely basis, are going to be liable for it that caused the harm in the first place. And I would just – I know my – I guess I have plenty of time here. You've got a whole minute and 18 seconds. Well, I'm going to pivot to a couple of things because on this notion of, like, on the likelihood of success, it is not true that they contracted around the obligation that they plainly had. First off, terminals absolutely is a co-permittee. The EPA cited terminals expressly for violations of the permit at the record at 4701 for notice of violation, and again in the emergency order in the record at 4721. Those are – you, terminals, erred and violated this permit. And they have a – they do have the TOA on the ROA, but it's like the most inaccurately quoted document I've ever seen in the briefing because it says you can't unduly interfere. Well, the undue interference is exactly, as Judge Bibas said, which is you have to, one, make sure that what they're doing is done right. Those same agreements also carve out and say this does not negate or obviate any condition or restriction set forth in any permit. Like, they expressly carve that out, number one. Number two, there's a shared service systems agreement in the record at 5165 that has an express provision that allows contractually between terminals and refining. The other one, each one to step in when the obligation to act under the permit is there. It calls out the permit expressly. This whole thing is a facade. They have the obligation. Okay. Thank you. Appreciate the arguments. We'll hear from Mr. Orlofsky on rebuttal. Well, first of all, the district court found that the shared services agreement, standing alone, was not enough to avoid the separateness, if you will. It wasn't standing alone, though, was it? Well, I'm quoting her opinion. She said that that shared services agreement did not negate standing alone the separateness of the two entities. Oh, yeah. We're not piercing the corporate veil. Okay. Well, Mr. Koresh made some comments about the shared services agreement being a sham. It wasn't, and the district court upheld it. She went on to find under the Title V permit that terminals was a co-permittee and had a duty to ensure that refinery complied with the Clean Air Act. Right. So my point is that the shared services agreement was not a sham agreement. Okay. She didn't pierce the corporate veil, and my understanding is that that's not an issue that's in front of us, so not a matter of concern, I don't think. Okay. Well, he made that point. Go ahead. My understanding is, while Judge Becker's opinion in Adams v. Freedom Forge does talk about the situation where you have an uncertified class, he does point out that that has to be supported by evidence. Now, I think we've already beaten that issue to death, but I think the fact that there's an uncertified class is also a factor that this court should consider in determining whether the amount of the bond was properly set. Explain that to me. Why is that? Well, because you have a much larger group of people, and it's going to increase the ultimate cost of the water program to my client. Right. But the assertion, here's the point that it will be helpful for you to speak to, Mr. Orlovsky. Your colleague has said this is a merchant relief, a true water emergency. In other words, I take the argument to be there's no sitting around waiting for a class certification here. People have to have water to live. They've got to have it. I think the judge actually did a beautiful job in her opinion in making that out. She said something like we rely on clean water not only to drink, shower, brush our teeth, when we bathe our children, cook for friends and family, wash the dishes in our favorite clothes, et cetera. This is not something you can do without. While for months and months lawyers argue about class certification, you've got to get relief to people. That's the point I understand them to be making. Does Adams prevent that kind of an approach by the court that says we'll take care of the people first and we'll worry about class certification later? Well, in candor, much as it pains me to admit it, I think that Adams would permit that. Okay. Unless the court has any further questions. I did have a question. Just a question on Phase 2, the Phase 2 hearing. I just want to ask you about your client's position. In looking at the opening brief, it didn't seem to really fuss so much about Phase 2. It was really focused on irreparable harm and the bond. The reply brief started to talk more about the Phase 2 geographic scope, the estates that are subject to the injunction. The challenge I had in reviewing it is to try to figure out which estates, as the term is used here, are being challenged by the defendants. You know from, because we know each other, we know from your past experience, you were a district court judge in Truffle Hunters. We are not. And the question I have is which estates are you guys objecting to or is that really not something you're pushing, the geographic scope? Well, I think our general position is that the district court didn't focus specifically or define the estates to be covered with the requisite degree of specificity. Even though she identified the areas in different categories, identified the specific estates within each, and even though there are at least two fonts of evidence that support each one, what more specifics should she have done? Well, I think the over, I think it was overreach. I know that she did do some analysis, et cetera, et cetera, but some of the estates that she included really were not affected by the releases. So back, so there lies my question. Which one are they? In trying to focus our efforts to understand from this record, which ones were insufficiently supported? Well, I think we, I don't have it in front of me, but I think we identified those estates that we thought should not be included in our reply brief. Okay. Okay, thank you very much. Thank you. Appreciate argument from counsel. We've got the matter under advisement. Thank you, Your Honor. Oh, thanks. And counsel will ask the parties to share the costs of providing a transcript for us of this oral argument. We will do that, Your Honor. Of course, Your Honor. Thanks.